**Affirmed and Memorandum Opinion filed July 12, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00087-CV

## IN THE INTEREST OF B.L.H., A CHILD

**On Appeal from the 309th District Court
Harris County, Texas
Trial Court Cause No. 2016-48778**

## M E M O R A N D U M   O P I N I O N

Appellant T.D.S. ("Mother") appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her child B.L.H. ("Bonnie").[1] The trial court terminated Mother's parental rights on predicate grounds of endangerment and failure to comply with a family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), and (O) (West Supp. 2017). The trial court further found that

---

[1] Bonnie is a pseudonym. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

termination of Mother's rights was in the child's best interest. In five issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings on each predicate ground, as well as the best-interest finding. Mother also challenges the appointment of the Department as managing conservator. W.B.H. ("Father") executed a voluntary relinquishment of his parental rights. Father has not appealed the termination of his parental rights. Because we conclude the evidence is legally and factually sufficient to support the trial court's findings, we affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Pretrial Proceedings

### 1.    Pretrial Removal Affidavit

At the time of Bonnie's removal Bonnie and Mother were living with Mother's mother, B.S. ("Grandmother"), and Mother's sister, T.C. ("Terri"), in the home of J.S. ("Jack"). The Department received a referral that Grandmother smoked marijuana and used Xanax daily in front of the children.[2] It was alleged that Terri and Mother engage in prostitution at Jack's house. Another resident or visitor to the home, J.B., was reported to smoke "Sherm" in the home in front of the children. "Sherm" is described in the affidavit as "crack laced marijuana blunts." It was alleged that the "children get a contact high from the drug use." Mother also regularly smoked marijuana in the home in front of the children. It was also reported that the children are present during physical alterations between family members because all of the family members live in a one-bedroom apartment. It was further alleged that sex trafficking occurs with the family members.

---

[2] Mother has two children, Bonnie and N.S. N.S. lives with her father and the record does not reflect whether Mother's rights to N.S. have been terminated.

The Department requested removal of Bonnie from Mother's care due to Mother's drug use and prior Department history. When Mother was involved with the Department the prior year she was unwilling to work Family Based Safety Services. At that time, Bonnie was in a Parental Child Safety Placement with her paternal great grandmother. Bonnie's alleged father was incarcerated. It was the Department's opinion that there was an immediate and continuing danger to the child if she was allowed to live with Mother.

## 2. The Investigation

The Department caseworker interviewed Terri in her home. Terri was seventeen years old at the time and denied seeing anyone fight or argue in the home. She also stated that no one smokes or drinks in the home although she smokes "weed from time to time." Terri denied engaging in prostitution and blamed J.W. ("Jenny") for making the referral because Mother "beat up" Jenny.

The caseworker interviewed Mother, who also alleged the referral was retribution for her fight with Jenny. Mother reported that Bonnie's father is incarcerated for possession of illegal drugs. Mother is employed by Priority Health Care and receives no other income or financial assistance. Mother was arrested once for assault when she was sixteen years old. Mother does not see a doctor regularly, but does not report physical or mental health issues. Mother smokes marijuana occasionally. Mother denied all the allegations in the Department referral except the allegation that she smoked marijuana. Mother denied being a prostitute or using "hard" drugs. Mother reported that "she and [Jenny] had a fist fight and that this is all because [Jenny] got her ass whooped."

## 3. Department and Criminal History Pre-dating the Referral

In May 2015, the Department received a report of neglectful supervision by

Mother. Mother was sent to Family Based Safety Services, but was unwilling to complete services. Mother also tested positive for drugs. Mother was convicted of a Class C traffic offense three years before the referral.

The removal affidavit also lists referrals the Department received alleging medical neglect and physical abuse of Mother and her siblings in April 2000, March 2002, and November 2002.

### 4. Pretrial Orders

On January 26, 2017, the trial court held a full adversary hearing pursuant to chapter 262 of the Texas Family Code. The trial court found sufficient evidence to satisfy a person of ordinary prudence and caution that there is a continuing danger to the physical health and safety of the child and for the child to remain in the home is contrary to the welfare of the child. The court ordered that the Department be named Bonnie's temporary managing conservator; the court also ordered both parents to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of the suit. According to the trial court's order, Mother was present at the hearing; Father was notified, but did not appear.

On March 23, 2017, the trial court signed a Status Hearing Order. The order stated that the trial court had reviewed the service plans filed by the Department, approved the service plans, and made them orders of the court.

On June 30, 2017, the caseworker filed a permanency report in which it was noted that Mother's service plan required her to:

- maintain stable housing and verifiable employment;
- attend and participate in all court hearings, Permanency Conferences, scheduled visitations, and meetings requested by the Department or the courts;
- make the necessary arrangements for transportation to ensure the

4

timely completion of the tasks outlined in this service plan;

- participate in individual therapy sessions and follow all recommendations;
- participate in psychological assessment and follow all recommendations;
- complete parenting classes and provide certificate of completion to the Department;
- participate and complete random drug testing;
- refrain from criminal activity;
- participate in a drug and alcohol assessment and follow all recommendations;
- maintain communication with the caseworker; and
- obtain and maintain legal employment.

The report listed Mother's progress toward compliance with the goals of the family service plan.

On July 20, 2017, the trial court signed a permanency hearing order in which it found that Mother had not demonstrated adequate and appropriate compliance with the service plan.

On September 29, 2017, the caseworker filed another permanency report, which also detailed the requirements of the service plan and the progress being made toward those requirements. With regard to stable housing and verifiable employment, the report noted that Mother was living with a relative and working with a home health company. With regard to participation in court hearings, permanency conferences, scheduled visitations, and meetings requested by the Department or the courts, Mother attended the first permanency hearing by phone, but failed to attend court hearings or the second permanency hearing. With regard to making necessary arrangements for transportation to ensure the timely completion of tasks outlined in the service plan, Mother "had issues coming to appointments or

5

visitations due to lack of transportation." With regard to participation in individual therapy sessions, Mother had not begun individual counseling. Mother completed a psychological appointment on June 30, 2017. It was recommended that she receive a psychiatric evaluation and participate in substance abuse treatment, individual therapy, and parenting classes. Mother had not completed a psychiatric assessment, substance abuse treatment, or a parenting class. Mother had not participated in parenting classes or attended drug testing. Mother failed to refrain from criminal activity because she was charged with "Unlawful Possession of a dangerous drug." Mother was a "no call/no show" for her first and second substance abuse assessment appointments. Mother maintained communication with the caseworker and signed a release of information form allowing to caseworker to receive information from all non-Department paid service providers. Mother adhered to the "once every other week" supervised visitation schedule.

## B.    Trial Testimony

At the beginning of trial Mother's attorney requested a continuance to allow Mother to complete the requirements under the service plan. The trial court denied the request.

Father testified that he and Mother have been in a relationship and have been living together since Bonnie was one week old. When Bonnie was two years old Father was incarcerated for eight months. Father was convicted of delivery of cocaine, but does not consider himself to be a drug dealer. Father denied using cocaine, but admitted using marijuana. While Father was in jail his relative initially cared for Bonnie. At some time while Father was in jail, Bonnie and Mother moved in with Grandmother. Father knew about Mother's marijuana use, but said she did not use any other drugs. In July 2017, Father tested positive for marijuana, amphetamine, cocaine, and methamphetamine. Father admitted that he missed three

6

to four scheduled drug tests.

Mother testified that she received her service plan, but did not understand that her parental rights could be terminated if she did not comply with the plan. Mother was living with a "relative, slash, friend" at the time Bonnie came into care. Mother began smoking marijuana when she was sixteen. Mother testified she takes Abilify, Trazodone, and Xanax for anxiety and bipolar disorder. Mother admitted having a physical altercation with Jenny at a hospital where Mother's relative was recuperating. Grandmother also had an altercation with Jenny and was arrested as a result of the altercation. Mother earns approximately $850 per month as a home healthcare worker. Grandmother helps Mother pay her $750 per month rent. Mother admitted missing six to seven scheduled drug tests before trial. Mother sent a copy of her apartment lease to the caseworker via text message. Mother provided two pay stubs to the caseworker. Mother admitted a felony conviction for reckless injury to an elderly person, which involved an altercation with her other child's paternal grandmother. Mother has not reported her felony conviction to her home healthcare employer.

As to the required services, Mother testified that by the time she contacted the free parenting class it was no longer being offered. Mother was unable to take the online parenting classes because they were too expensive. Mother completed a drug assessment, which recommended individual or group classes. Mother did not follow through with the Wellness Center to attend classes. Mother completed a psychological assessment, and was permitted to continue seeing her treating psychiatrist afterward. Mother was unable to provide documentation of her visits to her psychiatrist because she could not afford to pay the psychiatrist's fee for the documents. A counselor who was assigned to the case held sessions at Mother's home at least four times.

7

During Mother's cross-examination, trial was recessed and did not resume until almost three weeks later. When trial resumed Father had executed a voluntary affidavit of relinquishment. Father testified that he did so freely and voluntarily. Cross-examination of Mother resumed after acceptance of Father's affidavit.

Mother took one drug test after Bonnie was removed, which was positive. During the three-week recess, the caseworker, in an attempt to obtain Mother's psychiatric records, asked Mother for the name and phone number of Mother's psychiatrist. Mother did not comply with the caseworker's request. Before Bonnie was removed from the home, five people were living in the one-bedroom apartment including Mother and Bonnie. Mother testified that the other three people were Grandmother, Jenny, and Jenny's daughter. The pretrial removal affidavit indicated that Grandmother, Jack, and Terri were living in the apartment as well. Mother's uncle and his mother were occasionally in the apartment and frequently engaged in physical altercations with each other. Mother was aware that the adults were fighting in the apartment. She was unaware whether anyone other than her was using drugs. Mother missed visiting Bonnie on Bonnie's birthday because Grandmother was late giving her a ride to the visit. Mother admitted not attending every court hearing that had been held during the pendency of the termination case.

Mother testified that when she was first investigated by the Department it was also due to a physical altercation with Jenny. Mother testified the current referral was also a result of an altercation with Jenny.

Mother testified that she attended every visit with Bonnie in June and July 2017. Some drug tests were scheduled for the same day as the visits. Although Mother was able to get transportation to the visits with her child, she claimed she was unable to get transportation to the drug tests even when they were scheduled on the same day. Mother recently accepted a second job and engaged Grandmother and

her sister for childcare. Mother missed several court dates because she did not know about them or had family issues that prevented her from coming to court. Mother admitted smoking marijuana every other day, but did not do so in front of her child.

During trial Mother took a drug test, which was positive for marijuana. Mother claimed the positive test was the result of being exposed to marijuana at a Hookah bar.

The caseworker testified that at the time of trial Bonnie was placed with a foster family living in Georgetown, Texas. Bonnie was originally placed with her paternal grandmother. Bonnie was removed from that placement after the caseworker observed a burn mark on Bonnie's leg. Neither the paternal grandmother, Father, nor Mother adequately explained how the burn occurred. Both Father and Mother claimed the burn was over a year old, but the treating physician did not agree. The foster family is meeting Bonnie's physical and emotional needs and has been identified as a potential adoptive home.

With regard to the family service plan, the caseworker testified that she had not received a recent psychiatric assessment, and Mother did not complete individual therapy, drug classes, or parenting classes. Mother attended one drug test immediately after removal, but did not attend any drug tests until the one that was conducted during trial, which was positive.

Mother gave the caseworker two names of potential relative placements for Bonnie. The first placement, Terri, did not have an apartment. Before Terri could get an apartment, she was ruled out because she was "saying terrible things to the foster parents." The next person was one of Father's relatives. That relative withdrew from consideration because the people who lived with her did not want to disclose information to the Department. Grandmother gave the caseworker another two names who had been contacted just prior to the caseworker's testimony and had

9

not yet returned the caseworker's call.

With regard to parenting classes, the caseworker testified that Mother did not tell her she was having trouble locating affordable classes. The caseworker said if Mother had communicated her issues, she would have assisted her in finding free or affordable parenting classes. Mother has missed two court hearings during the pendency of the termination proceeding. Mother did not request assistance from the caseworker in completing the tasks required by the family service plan.

Mother did not complete her drug and alcohol assessment until approximately one month before trial. The caseworker had scheduled two prior assessments that Mother failed to attend. Mother provided the caseworker with pay stubs to verify her income. Mother told the caseworker she had obtained a psychiatric evaluation, but failed to provide proof of the evaluation despite being asked to do so several times. Mother explained during trial that she could not afford to obtain the evaluation. The caseworker asked Mother for a signed release so that the caseworker could obtain the evaluation on her own. After trial started Mother gave the caseworker a release, but the phone number Mother gave for the psychiatrist was not working. Mother attended some therapy sessions, but did not complete the sessions before the trial started.

With regard to removal of the child from the paternal grandmother, the caseworker testified that the Department was concerned with people who were regularly visiting the home. When the caseworker and the "kinship worker" explained that the Department needed to know everyone who was interacting with Bonnie, the individuals refused to give information to the Department. The caseworker took Bonnie to the doctor because the paternal grandmother failed to take Bonnie to the doctor or dentist. The caseworker explained that a doctor's evaluation and a dentist's evaluation are required of all children in the Department's

care.  Bonnie was removed from the paternal grandmother after being seen by a doctor.

The caseworker testified that she gave the family service plan to Mother on March 2, 2017.  A few days before March 2, the caseworker spoke with Mother on the phone and told her they needed to meet to review the family service plan.  The caseworker learned of a free parenting class in June and told Mother about it.  By the time Mother tried to register for the free parenting class it had ended.  Again in September the caseworker told Mother that she needed to take an in-person parenting class.  The caseworker explained that if Mother had any issues trying to find a class that she would help her.  Mother did not contact the caseworker and tell her she could not afford parenting classes.  The caseworker testified that if she had known Mother could not afford the classes the Department could help her find a free class or one that would accept payment on a sliding scale.

Bonnie has been in a new foster home since November 2017.  Bonnie adjusted to the transition and was doing well.  The family was selected with Bonnie's specific needs in mind.  Those needs were described as "a loving family, an adequate home." The Department conducted a home study on the foster family, which included reviewing their family life, income, jobs and schedule of both parents, daycare services, and schools available to the child.  The caseworker has visited Bonnie with the foster parents and has no doubts that the parents are an appropriate choice for Bonnie.

Terri testified that she had children removed from the same home at the time Bonnie was removed.  Terri testified that she never saw Mother smoke marijuana in front of Bonnie.  When Mother was working Bonnie would stay with Terri.

A family member testified that she was available to help Mother with transportation and never told Mother she could not give her a ride if she needed it.

The family member is a Metro bus driver who gave Mother bus fare if Mother needed it.

At the conclusion of trial, the trial court found clear and convincing evidence that Mother endangered Bonnie, failed to comply with the family service plan, and that it is in Bonnie's best interest to terminate Mother's parental rights. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), & (O); 161.001(b)(2). The trial court appointed the Department sole managing conservator of Bonnie.

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264.

The heightened burden of proof in termination cases results in a heightened

12

standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We review the legal sufficiency of the evidence by considering all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not compel us to disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing burden, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

13

**B.     Trial Court's Section 161.001(b)(1)(O) Finding**

In her third issue Mother argues the evidence is legally and factually insufficient to support the trial court's finding under subsection O of section 161.001(b)(1).  Only one predicate finding under section 161.001 is necessary to support a judgment of termination when the trial court also finds that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

To terminate parental rights pursuant to subsection O, the Department must show that (1) the child was removed under chapter 262 of the Texas Family Code for abuse or neglect, (2) the child has been in the managing conservatorship of the Department for at least nine months, and (3) the parent "failed to comply with the provision of a court order that specifically established the actions necessary for the parent to obtain the return of the child."  Tex. Fam. Code Ann. § 161.001(b)(1)(O).

In her brief Mother does not challenge the requirements that the child be removed for abuse or neglect or that the child was in the Department's care for at least nine months. Mother challenges (1) the existence of a court order establishing actions necessary for the return of the child; (2) the sufficiency of the Department's original pleading; and (3) the sufficiency of the evidence to support the trial court's finding that Mother failed to comply with an order of the court.

*1.     Court order establishing actions necessary for return of the child.*

Subsection O first requires the existence of a valid, predicate court order that a parent has failed to comply with to obtain the return of the child.  *See In re J.F.C.*, 96 S.W.3d at 278.  Mother acknowledges that the caseworker spoke with her about services and many references at trial were made to a service plan, but Mother argues that because the service plan was not filed with the court or admitted into evidence, the Department failed to meet its burden to show the order's existence under

14

subsection O.

When a court signs an order appointing the Department as a temporary managing conservator under Chapter 262, as the trial court did here, the Department must file a service plan with the court. *See* Tex. Fam. Code Ann. § 263.101 (West Supp. 2017). A service plan must, among other things, (1) be specific; (2) state the goal of the plan, which may be the return of the child to the child's parents; and (3) state the actions and responsibilities necessary for the child's parents to take to achieve the plan goal. *See* Tex. Fam. Code Ann. § 263.102 (West Supp. 2017). The trial court "shall incorporate the original and any amended service plan into the orders of the court." Tex. Fam. Code Ann. § 263.106 (West 2014).

In this case, the family service plan was not admitted into evidence during trial and does not appear in the clerk's record filed in this appeal. Mother argues that the Department failed to meet its burden under subsection O because the service plan is not in the appellate record.

This court has consistently held that a "trial court is presumed to judicially know what has previously taken place in the case tried before it, and the parties are not required to prove facts that the trial court judicially knows." *In re J.J.C.*, 302 S.W.3d 436, 446 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also In re A.X.A.*, No. 04-09-00519-CV, 2009 WL 5150068, at *4 n. 3 (Tex. App.—San Antonio Dec. 30, 2009, no pet.) (mem. op.) (presuming that the trial court took judicial notice of the family service plan and the order adopting the plan).

In this case, the same judge who signed the order following an adversary hearing under Chapter 262 heard the evidence at trial. The same judge also signed the Status Hearing Order, which stated that the trial court had reviewed the service plans filed by the Department, approved the service plans, and made them orders of the court. The judge did not explicitly state that she was taking judicial notice of the

15

Chapter 262 order, which is contained in the clerk's record on appeal and orders Mother "to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." However, following our precedent, we presume that the judge took judicial notice.

Regardless of whether we presume judicial notice of the trial court's order, the record contains sufficient evidence that Mother knew what was required by the family service plan, and understood her failure to comply was a ground for termination of her parental rights. At trial, Mother admitted receiving the service plan in March from the caseworker, and did not dispute the fact that she signed the plan on March 2, 2017.

On the first day of trial, Mother testified as follows:

Q. Okay. You were aware of the services that were requested of you on your service plan?

A. Yes, ma'am.

Q. You knew that they were court ordered?

A. Yes, ma'am.

Q. And you knew at — you knew that if you didn't do those services that your rights could be terminated, correct?

A. No, ma'am. I just knew I had to do the services —

***

Q. Are you saying that nobody ever told you that if you could not provide your child with a safe and stable environment, your rights could be severely restricted and/or terminated?

A. No, ma'am.

Q. Do you know that the Court gives that admonishment or says that at every hearing?

A. Well, I didn't recall it.

Q. You don't recall hearing it?

A. No, ma'am.

16

On the second day of trial after extensive questioning about the service plan, Mother testified:

Q. And you understand that as part of your family service plan, you were to attend all court hearings and permanency conferences and family visits; attend all family visits?

A. Yes, ma'am.

*** 

Q. Do you want your child back with you?

A. Yes, ma'am.

Q. And are you willing to work services to get her back?

A. Yes, ma'am.

Q. And you understand that the reason why you are in this position is because you really haven't done a lot of your services?

A. Yes, ma'am.

The caseworker testified that she gave Mother a family service plan, that Mother signed the plan on March 2, 2017, and Mother did not complete the services requested of her on the plan. The caseworker further testified, "The department has offered [Mother] a family plan of service that outlines necessary requirements that would express — that would detail to the department, if completion of services, that [Bonnie] would be returning to a safe environment." The caseworker further testified that when Mother received her service plan she read aloud the statement on the plan that explained her parental rights would be terminated if she did not complete the plan. Although Mother gave conflicting testimony about whether she understood the consequences of failure to work her services, the trial court could have believed Mother's statements that she did understand in addition to the caseworker's testimony that the consequences were explained to Mother and that Mother read them aloud.

We note further that although Mother complains about the Department's

17

failure to file the service plan with the court, Mother has not demonstrated that the plan was not filed, only that it does not appear in the record. But the record shows the court reviewed and adopted the plan, thus satisfying the purpose of providing a plan to the court within a certain time period following appointment of the Department as temporary managing conservator. *See* Tex. Fam. Code § 263.101. In any event, Mother makes no claim that her due process rights were violated by failure to file the plan. *Cf. In re T.T.F.*, 331 S.W.3d 461, 464 (Tex. App.—Fort Worth 2010, no pet.) (parent claimed deprivation of due process because Department did not obtain her signature on the service plan).

Accordingly, we hold that Mother was aware of the existence of a valid, predicate court order that established the necessary actions for return of her child. *See In re A.W.B.*, No. 14-11-00926-CV; 2012 WL 1048640 at *3–4 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (mem. op.) (holding that trial court can take judicial notice of prior proceedings, and that parent's testimony reflecting knowledge of family service plan and its consequences was sufficient to uphold trial court's finding under subsection O).

### 2.     *Sufficiency of the Department's original pleading*

Mother further argues that the Department's pleadings are insufficient to support the judgment of termination under subsection O because the original petition asks only for the court to order "actions necessary for the father to obtain the return of the child." The original petition reads as follows with regard to termination of Mother's parental rights:

> If reunification with the mother cannot be achieved, the Court should terminate the parent-child relationship between [Mother] and the child, [Bonnie], the subject of this suit under Chapter 161, Texas Family Code, because termination of the parent-child relationship is in the child's best interest and [Mother] has committed one or more of the

18

following acts or omissions:

***

> failed to comply with the provisions of a court order that specifically established the actions necessary for the *father* to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to §161.06l (b)(1)(O), Texas Family Code[.] (emphasis added).

Mother argues that in failing to name her specifically, the Department has not plead subsection O grounds against her. In other words, Mother claims that by mistakenly including the word, "father" rather than "mother" in one place in the paragraph listed under mother's name in the petition, and even though the pleading makes clear that the Department was seeking to terminate Mother's rights, the Department's pleadings are insufficient to terminate her parental rights under this ground.

Under Texas Rule of Civil Procedure 301, a judgment must conform to the pleadings. Tex. R. Civ. P. 301. A judgment unsupported by pleadings is generally void. *In re Estate of Gaines*, 262 S.W.3d 50, 60 (Tex. App.—Houston [14th Dist.] 2008, no pet.). However, issues not raised in the pleadings can be tried by express or implied consent of the parties. Tex. R. Civ. P. 67; *Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.–Houston [14th Dist.] 2013, no pet.). To determine whether an issue was tried by consent, we examine the record not for evidence of the issue, but rather for evidence that the issue was tried. *Adeleye v. Driscal*, 544 S.W.3d 467, 484 (Tex. App.—Houston [14th Dist.] 2018, no pet.). An unpleaded issue may be deemed tried by consent when the evidence on the issue is developed without objection under circumstances indicating both parties understood the issue was being contested. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009) ("When both

19

parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the defects are waived."); *see also In re K.S.*, 448 S.W.3d 521, 533 (Tex. App.—Tyler 2014, pet. denied) (applying doctrine of trial by consent in a parental termination case).

The trial court has broad discretion in determining whether an unpleaded issue was tried by consent. *Adeleye*, 544 S.W.3d at 470-71. Presuming that the issue was "unpleaded," the record reflects nonetheless that, as noted by the excerpted testimony above, all parties understood the Department was seeking to terminate Mother's parental rights on the grounds that she did not comply with the family service plan. Mother did not raise the purported defect in the pleadings until after trial, immediately before the trial court signed the decree of termination. The court stated on the record, "I believe my finding would have been based upon the testimony and the evidence presented. And I do show that mother was terminated under D, E, and O." We conclude the issue was tried by consent and the trial court did not abuse its discretion by terminating Mother's rights on subsection O grounds despite the purported defect in the Department's pleadings.

3. *Sufficiency of the evidence to support the trial court's finding that Mother failed to comply with an order of the court.*

Finally, Mother contends that her failure to complete every item on the service plan would not support termination of her parental rights. Mother's service plan required her to:

- maintain stable housing and verifiable employment;
- attend and participate in all court hearings, Permanency Conferences, scheduled visitations, and meetings requested by the Department or the courts;
- make the necessary arrangements for transportation to ensure the timely completion of the tasks outlined in this service plan;

20

- participate in individual therapy sessions and follow all recommendations;

- participate in psychological assessment and follow all recommendations;

- complete parenting classes and provide certificate of completion to the Department;

- participate and complete random drug testing;

- refrain from criminal activity;

- participate in a drug and alcohol assessment and follow all recommendations;

- maintain communication with the caseworker; and

- obtain and maintain legal employment.

Mother admits she has not complied with every requirement of the service plan. Specifically, she did not attend all drug tests, court hearings, or visitations. She also did not complete parenting classes or counseling as recommended by the drug and alcohol assessment.

Texas Family Code section 161.001(d), effective September 1, 2017, establishes a defense to subsection O. *See* Tex. Fam. Code Ann. § 161.001(d) (West Supp. 2017). That defense provides that a trial court may not terminate the parent-child relationship under subsection O if the parent proves by a preponderance of the evidence that: (1) the parent was unable to comply with specific provisions of the court order, and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent. *Id*. In the decree for termination the trial court found that Mother failed to raise a defense based on section 161.001(d) and, even if presented, there was no proof by a preponderance of evidence that Mother (1) was unable to comply with specific provisions of a court order; and (2) Mother made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of

the parent.

Mother admits she did not fully comply with the service plan, but challenges the sufficiency of the evidence to support trial court's finding that she did not raise a defense or prove she was unable to comply with the family service plan through no fault of her own. Mother argues that her failure to meet all the requirements of the family service plan is excused by her lack of transportation and inability to pay for certain services.

In asserting she met her burden of proof under section 161.001(d), Mother argues she missed her drug tests, court hearings, and some visitations because she did not have a working car or money for bus fare. This testimony was disputed by Mother's relative who agreed to drive Mother to her appointments and would have given Mother bus fare if she had asked. The caseworker also testified that the Department would have helped Mother with transportation if Mother had communicated her difficulty with transportation. Mother also asserts she missed court hearings because she did not know about the hearings. Mother was represented by counsel at the time of the missed hearings and was informed of the hearing dates by counsel.

In finding that Mother did not meet her burden, the trial court could have believed the testimony of Mother's relative and her caseworker and could have disbelieved Mother's testimony. We are not to second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible. *In re F.E.N.*, 542 S.W.3d 752, 761 (Tex. App.—Houston [14th Dist.] 2018, pet. filed). We conclude that the trial court's finding that Mother did not raise a defense under section 161.001(d) or, if raised, provide proof of such a defense by a preponderance of the evidence, is supported by legally and factually sufficient evidence.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights was justified under Family Code section 161.001(b)(1)(O). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(O). Accordingly, we conclude the evidence is legally and factually sufficient to support the 161.001(b)(1)(O) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection O, we need not review the sufficiency of the evidence to support the subsections D and E findings. *See A.V.*, 113 S.W.3d at 362. We overrule Mother's third issue.

## C.    Best Interest of the Child

In her fourth issue Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the child.

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th

Dist.] 2017, no pet.); *see also* Tex. Fam. Code Ann. § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with her natural parents, and the burden is on the Department to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

In her brief Mother focuses on the excuse for her acts or omissions as a parent. Specifically, Mother emphasizes her inability to perform tasks required by the family service plan because of her limited finances and transportation needs. In reviewing the legal and factual sufficiency of the evidence to support the trial court's finding on best interest we are mindful of the fact that the focus in a best-interest analysis is not only on the parent's acts or omissions, but on the nature of the relationship the child has with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). Therefore, in analyzing whether termination of Mother's parental rights was in Bonnie's best interest, we focus on the evidence regarding the nature of the relationship between Bonnie and Mother.

## 1.    *Desires of the child*

At the time of trial Bonnie was three years old. When a child is too young to express her desires, the fact finder may consider that the child has bonded with the foster family, is well cared for by the foster family, and has spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). The record reflects Bonnie has been with the foster family for almost one year. The family is meeting her needs and is willing to adopt her. The record reflects that before coming into care Bonnie was living in a one-bedroom apartment

24

with at least five adults, two of whom engaged in physical violence with each other.

> 2. *Present and future physical and emotional needs of the child*

While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met on a daily basis. Mother has not provided for Bonnie's past or present physical and emotional needs. Mother's testimony reflects that Bonnie was living with her and several friends and family members who used drugs in the home. A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

> 3. *Present and future physical and emotional danger to the child*

Mother argues that the record contains no evidence that Mother was a danger to Bonnie. However, Mother admitted using marijuana, neglected to attend all visits and court hearings with regard to her parental rights, and admitted a conviction for a violent offense.

Evidence of a parent's unstable lifestyle can also support the conclusion that termination is in the child's best interest. *In re A.R.M.*, 14-13-01039-CV, 2014 WL 1390285, at *10 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.). In particular, a parent's drug use can support a finding that termination is in the best interest of the child. *Id*. Although a reasonable fact finder could fairly credit Mother's progress and decide it justified the risk of preserving the parent relationship, we cannot say the trial court acted unreasonably in finding the children's best interest lay elsewhere. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). It is not our role to reweigh the evidence on appeal, and we may not substitute our judgment of the children's best interest for the considered judgment of the fact finder. *See id.* at 531 (Frost, J.,

concurring).

     4.    *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the child with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother continued to use drugs and engage in violence after Bonnie was removed from her care. Mother contends she needs more time to complete services and demonstrate a safe and stable home. However, Mother was not candid with the court with regard to drug usage and her inability to find transportation to visitations, court hearings, and scheduled drug tests.

In contrast, the foster family is meeting Bonnie's emotional and physical needs, and is willing to adopt Bonnie.

     5.    *Programs available to assist in promoting the child's best interest*

In determining the best interest of the child in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d at 249. The caseworker testified that Mother failed to complete her family service plan. Although Mother contends she completed some services of the plan, as discussed herein, the evidence established that she did not fully complete the plan. Mother's excuse for the failure to complete the service plan was poor communication with the Department caseworker and lack of transportation. We note the fact finder had discretion to determine the weight and credibility of Mother's testimony. *See In re K.A.S.*, 131 S.W.3d 215, 229–30 (Tex. App.—Fort Worth 2004, pet. denied).

26

Mother's failure to complete the court-ordered service plan demonstrates that she is unwilling to take advantage of the services offered to her by the Department and casts doubt on her parenting abilities. *See In re I.L.G.*, 531 S.W.3d 346, 355–56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); Tex. Fam. Code § 263.307(b)(10), (11).

6. *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

In her brief Mother argues that she was unable to complete her service plan due to financial and transportation constraints. Mother further argues that her physical altercations were either the result of her abusive childhood or in self-defense or defense of others. Mother accuses the Department's caseworker of failing to assist her in completion of her service plan and "calculated inaction" leading to the termination of Mother's parental rights.

Mother's pattern of conduct reflects that termination is in the best interest of the child. Mother refused to submit to drug testing until trial and did not engage in services until shortly before trial. Mother continues to blame others for her failure to complete the service plan.

We conclude that legally and factually sufficient evidence supports the trial court's finding that termination was in the best interest of the child. We overrule Mother's fourth issue.

**D. Conservatorship**

In her fifth issue Mother argues the evidence is legally and factually insufficient to support the appointment of the Department as sole managing conservator. Specifically, Mother argues there was no evidence that appointment of Mother as managing conservator would significantly impair the child's physical

health or emotional development.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Protective and Regulatory Services, a licensed child-placing agency, or an authorized agency as a managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a) (West 2014). The trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.*, 261 S.W.3d at 92. Having found the evidence sufficient to support the best-interest finding, we conclude the trial court had sufficient information upon which to exercise its discretion, and did not abuse its discretion in appointing the Department as sole managing conservator of Bonnie. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights). We overrule Mother's fifth issue.

### III. CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection O. And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in Bonnie's best interest so that she could promptly achieve permanency through adoption. *See In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.


/s/     Kevin Jewell
        Justice


Panel consists of Justices Jamison, Wise, and Jewell.